UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DAMIEN DOWNING | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 09-2421 (ESH) |
| ROBERT C. TAPELLA, | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

Plaintiff Damien Downing, an African-American male employed by the Government Printing Office ("GPO"), claims that his employer discriminated against him on the basis of race when he was not promoted to the position of Data Center Director in November 2007, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Defendant has moved to dismiss for failure to state a claim upon which relief can be granted, or, in the alternative, for summary judgment. For the reasons stated herein, the Court will grant defendant's motion for summary judgment.

## BACKGROUND

At all times relevant to this case, plaintiff has been employed by GPO. (Def.'s Statement of Material Facts as to Which There Is no Genuine Dispute ["Def.'s SMF"] ¶ 6.) Plaintiff now works as a Supervisory Information Technology ("IT") Specialist in the End User Support Division of GPO's Information Technology and Systems ("IT&S") Department. (Compl. ¶ 11.)

1

When Bruce James became Public Printer of the United States, and thus, head of the GPO in 2003, he hired several new managers including Reynold Schweickhardt as Chief Information Officer and Bruce O'Dell as Director of Operations and Deputy Chief Information Officer. (Def.'s Ex. 3 (Downing Dep., Feb. 20, 2009) ["Downing Dep."] at 16:9-22, 17:1.) Shortly thereafter, Michael Wash was hired as Chief Technical Officer. (Def.'s Ex. 13 (Wash Dep., July 28, 2008) ["Wash Dep."] at 5:3-4.) Together, this new leadership of GPO's IT Department created a plan to reorganize the Department with the goal of "align[ing] the organization according to the characteristics of a world class IT organization." (Def.'s Ex. 12 (O'Dell Dep., Mar. 3, 2009) ["O'Dell Dep."] at 10:13-15.) The reorganization included plans to eliminate some positions (Downing Dep. at 18:9-18; Compl. ¶ 23), centralize several IT-related units into an IT&S Department (Compl. ¶ 24), and replace GPO's mainframe computer with an Oracle service because mainframe maintenance had become unsustainable. (O'Dell Dep. at 11:10-18; Downing Dep. at 17:3-15, 39:2-21.)

Plaintiff, evidently fearing the consolidation of his department and skeptical that the mainframe could be phased out as quickly as the reorganization plan indicated, objected to the plan. (Downing Dep. at 17:5-22.) He directly challenged its utility in a conversation with O'Dell, urging him to keep the mainframe and his team intact. (*Id.* at 17:18-22, 18:1-15.) Ultimately, however, reorganization occurred and disproportionately affected plaintiff's team, cutting its size by greater than fifty percent. (Downing Dep. at 18:9-20; Compl. ¶ 25.) The plan to eliminate the mainframe also created some uncertainty about plaintiff's position, since his work focused on supporting users interfacing with the mainframe. (Downing Dep. at 18:9-22.)

As part of the the evolution of IT&S, GPO officials created a Data Center in May 2007. (Wash Dep. at 21:1-14.) One purpose behind creating the Data Center was to streamline and

support the printing of passports. (O'Dell Dep. at 49:6.) The GPO began accepting applications for the new position of Supervisory IT Specialist, PG-2210-15, Vacancy Announcement Number 07-339 ("Data Center Director"), on October 19, 2007 (Pl.'s Ex. 2 at 1), and four individuals applied, including plaintiff. (Def.'s Ex. 5 at 1.)

Bart Hill, Director of the Systems Integration Division, was the Subject Matter Expert in charge of reviewing the applications and assigning a score to each candidate according to the candidate's Knowledge, Skills, and Ability ("KSA") responses. (Def.'s SMF ¶ 8.) Hill compared all four applications and selected Ernest Steele (a Caucasian) as the most qualified. (Def.'s Ex. 8 (Hill Dep., Feb. 18, 2009) ["Hill Dep."] at 22:13-16, 24:3-7; Def.'s SMF ¶¶ 3, 6.) As the Selecting Official for the Data Center Director vacancy, Hill submitted Steele's name to the Approving Official, Wash, who signed off on the selection. (Def.'s Ex. 5 at 1; Def.'s SMF ¶¶ 8-10).

For approximately seven months prior to his permanent appointment, Steele had worked as Acting Director of the Data Center.[1] (Wash Dep. at 21:14-16; Pl.'s Ex. 4 at 2.) Before that, plaintiff and Steele shared similar titles, similar tenure level, and the same pay grade. (Def.'s Ex. 6 (Steele Application, Oct. 13, 2007) ["Steele Appl."] at 3; Def.'s Ex. 4 (Downing Application, Oct. 25, 2007) ["Downing Appl."] at 3, 11.) Earlier in the reorganization process, when plaintiff's team was reduced in size, Steele's team absorbed some of plaintiff's former

---

[1] Although Steele was never officially given the title of Acting Director (O'Dell Dep. at 21:18-22, 22:1), his superiors (Wash and O'Dell) referred to him as such (Wash Dep. at 21:15-16; Pl.'s Ex. 4 at 2) and Steele signed his emails with the title. (Pl.'s Ex. 11 (Steele Dep., Mar. 3, 2009) ["Steele Dep."] at 9:8-17.) Meanwhile, according to O'Dell, Steele's responsibilities expanded to include "some of the duties" of the Data Center Director (O'Dell Dep. at 24:12-15), and internal GPO documents labeled him as Acting Director. (Pl.'s Ex. 1 at 1.) However, no pay adjustment or bonus accompanied the change. (Steele Dep. at 20:1-5.) Notwithstanding the parties' dispute over this ambiguity, it is immaterial (*see infra* Part II.B), and, therefore, the Court will proceed on the assumption that Steele served as Acting Director of the Data Center prior to his permanent promotion to Director.

3

staff. (Downing Dep. at 18:9-20; Compl. ¶ 29.)

Plaintiff sought EEO counseling on January 31, 2008, stating that he had been denied both the opportunity to serve as Acting Director and the promotion to Director because of his race. (Def.'s Ex. 2 ["EEO Compl."] at 1.) In addition to his disparate treatment complaint, plaintiff also claimed that the appointment of an Acting Director for the months prior to the official vacancy had given Steele an "unfair advantage" in the selection process. (*Id.*) On December 23, 2009, plaintiff filed this lawsuit alleging race discrimination in violation of Title VII, which is made applicable to the GPO by § 1408(c) of the Congressional Accountability Act, 2 U.S.C. § 1302(a)(2). Defendant has moved to dismiss or, in the alternative, for summary judgment.

## ANALYSIS

I. **LEGAL STANDARDS**

   A. **Standard of Review**

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment shall be granted "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56(c)). "A dispute about a material fact is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Haynes v. Williams*, 392 F.3d 478, 481 (D.C. Cir. 2004) (quoting *Anderson*, 477 U.S. at 248). A moving party is thus entitled to summary judgment "against 'a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Waterhouse v. District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see Wash. Post Co. v. Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e). If the non-movant fails to point to "affirmative evidence" showing a genuine issue for trial, *Anderson,* 477 U.S. at 257, or "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson,* No. 95-CV-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), *aff'd* No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 1999).

### B. Title VII

Under Title VII, it is an "unlawful employment practice" for employers "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Traditionally, courts have examined Title VII claims for discrimination under the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973). However, where an employer has asserted legitimate, non-discriminatory reasons for the actions being challenged by the plaintiff,

> the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

A plaintiff has the burden of persuasion to show that a defendant's proffered nondiscriminatory reason for the challenged action is a pretext. *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 654 (D.C. Cir. 2003)). A plaintiff can carry this burden by showing that a non-discriminatory reason offered by a defendant is false, *see, e.g.*, *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008), or otherwise "presenting enough evidence to allow a reasonable trier of fact to conclude that the employer's proffered explanation is unworthy of credence." *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (internal quotation marks omitted).

In a nonpromotion case, plaintiff will satisfy his burden if he can demonstrate that "a reasonable employer would have found the plaintiff to be significantly better qualified for the job." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc); *see also Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006) (citing *Aka*'s "significantly better qualified" standard with approval). Put another way, courts find "no inference of discrimination where the evidence present[s] no 'stark superiority' of plaintiff's credentials over those of the successful applicants." *McIntyre v. Peters*, 460 F. Supp. 2d 125, 136 (D.D.C. 2006) (quoting *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003)). As the D.C. Circuit has explained:

> [P]ointing to differences in qualifications that merely indicate a 'close call' does not get [plaintiff] beyond summary judgment. This Court will not reexamine

> governmental promotion decisions where it appears the Government was faced with a difficult decision between two qualified candidates, particularly where there is no other evidence that race played a part in the decision.

*Stewart v. Ashcroft*, 352 F.3d 422, 430 (D.C. Cir. 2003).

Moreover, where "the employer's stated belief about the underlying facts is reasonable in light of the evidence, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts," and summary judgment is appropriate. *Id.*; *see Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997) ("[I]f [a plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [the defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [the plaintiff].") In assessing plaintiff's case, the Court is also mindful that "Title VII . . . does not authorize a Federal court to become a 'super-personnel department that reexamines an entity's business decisions,'" *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chi. Trib. Co.*, 797 F.2d 458, 464 (7th Cir. 1986)), and that courts "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Fischbach v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

## II. PLAINTIFF'S LAWSUIT

Title VII "establishes two elements for an employment discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, color, religion, sex, or national origin." *Brady*, 520 F.3d at 493. "A plaintiff must prove both elements to sustain a discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

Plaintiff alleges that defendant discriminated against him on the basis of his race by not promoting him to the position of Data Center Director. The parties do not dispute that plaintiff applied for a promotion to Data Center Director and was not selected (Def.'s SMF ¶¶ 3, 6; Compl. ¶¶ 39, 48), so the element of an adverse personnel action is not at issue. As for the discriminatory animus required for the second element of a Title VII claim, plaintiff's arguments focus on two issues: whether defendant's claim that Steele was simply the most qualified applicant for the position is based on pretext, and whether defendant pre-selected Steele for the position before the application process even began. The Court finds first that plaintiff has failed to "produce sufficient evidence that the Government's asserted non-discriminatory reasons for the actions were pretextual and that he suffered discrimination on account of his race," *Baloch*, 550 F.3d at 1195, and second, that pre-selection does not bear materially on the Title VII claim in the absence of any evidence that the pre-selection was itself discriminatorily motivated.

A.  **Pretext**

Defendant asserts that Steele was the most qualified applicant for the position of Data Center Director, especially given the importance of mainframe hardware experience in the selection process. Plaintiff responds by arguing that prioritizing hardware experience constituted a pretext for defendant's discrimination. There is, however, *no* evidence that plaintiff was *better* qualified for the position, and there is every indication that defendant's desire for a Director with hardware experience was reasonable. Thus, no material fact is genuinely at issue, and no reasonable jury could find that defendant's nondiscriminatory reasons for its action were pretextual.

Plaintiff was prompted to file an EEO complaint and then this action by his belief that his race motivated the GPO to neither allow him to serve temporarily as Acting Director of the Data

8

Center nor promote him to Data Center Director. To carry his burden of demonstrating the superiority of his own credentials, plaintiff's complaint alleges that he "believes he was better qualified than Mr. Steele for this position." (Compl. ¶ 49.) But his own admissions to an EEO investigator, recorded in plaintiff's affidavit, completely undercut any allegation that he was more qualified than Steele. There, plaintiff estimates that "Steele and [plaintiff] would have been *equally* qualified for the position *until* Mr. Steele was given the Acting role." (Pl.'s Ex. 6 (Downing Aff., June 13, 2008) ["Downing Aff."] at 7 (emphasis added).) Therefore, plaintiff concedes that even before Steele's promotion to Acting Director, he was not "significantly better qualified" than Steele. *See Aka*, 156 F.3d at 1294. As a result, a reasonable juror could only conclude that "the employer simply made a judgment call." *See id.*

At best, the evidence supports plaintiff's own belief that, as between him and Steele, defendant faced a close call. But in fact, the two candidates' applications for the promotion show, if there was any disparity, that Steele was more qualified than plaintiff. Each of the two candidates boasted over three decades of computed federal service, although Steele had slightly more than plaintiff. (*See* Downing Appl. at 11 (service computation date for leave: Apr. 3, 1975); Steele Appl. at 14 (service computation date for leave: June 10, 1974).) Both candidates had been reviewed as "Level 4 (EXCELLENT)" on their recent Employee Performance Ratings, although Steele's was more recent than plaintiff's by one year. (*See* Downing Appl. at 10; Steele Appl. at 13.) Each has a bachelor of science degree; Steele's is in information technology and plaintiff's is in business administration. (*See* Downing Appl. at 6; Steele Appl. at 11.) And the two were at comparable tenure levels prior to the reorganization, each at PG-2210-14 posts, with Steele overseeing the Configuration Management Branch and plaintiff the Technical Support Branch. (*See* Downing Appl. at 3; Steele Appl. at 3.) Plaintiff also describes his and Steele's

9

prior roles similarly: Steele "supervise[d] the GPO mainframe hardware," while plaintiff was "the mainframe software supervisor." (Pl.'s Statement of Genuine Issues of Fact in Dispute ["Pl.'s SGI"] ¶¶ 7-8.)

Viewing this evidence in the light most favorable to plaintiff, the Court finds that the record, at best, merely indicates a "close call" or "difficult decision between two qualified candidates." *See Stewart*, 352 F.3d at 430. After all, even if plaintiff is correct that "[t]he job involved responsibility for both the software and hardware of the mainframe" (Pl.'s SMF ¶ 6), two equally qualified candidates with experience in mainframe software and mainframe hardware, respectively, present the very situation that *Stewart* contemplates, *i.e.*, a "difficult decision between two qualified candidates" and thus the need for plaintiff to show a more significant difference in qualifications.

Aside from his opinions about his relative qualifications for the job as Data Center Director, the only evidence plaintiff offers to support his allegation of discrimination is Melvin Eley's assertion that GPO has a track record of not promoting African-American candidates. Eley is the End User Support Division Director and plaintiff's supervisor. (Pl.'s Ex. 15 (Eley Aff., July 29, 2008) ["Eley Aff."] at 1.) He has "recently filed an EEO complaint against Mr. Wash," and he stated that Wash has a record of not hiring "a Black in any position since he came to the GPO . . . ." (*Id.* at 2) On the other hand, when referring to Hill, the Selecting Official who first chose Steele rather than plaintiff for the promotion, Eley stated only, "I have no reason to believe he would discriminate against [plaintiff] based on his race or color." (*Id.*) Eley demonstrates his lack of relevance to the present case, by stating:

> I had no involvement in the recruitment of [Data Center Director]. I do not know why [plaintiff] was not selected, I do not know the selecting official, I do not know who were referred. I do know that Ernie Steele was selected for the position. I

10

personally know Ernie Steele but I do not know his experiences or background. He has never worked for me.

(*Id.* at 1.) Eley's perspective is clearly not germane to the decision to not select plaintiff and to the specific individual complaint that decision has prompted.

Finally, as evidence of pretext, plaintiff relies on the alleged inconsistency between the GPO's intent to eliminate the mainframe and its proffered preference for Steele's mainframe hardware experience. Because plaintiff and Steele held roughly analogous positions, with Steele having more hardware exposure and plaintiff having more end-user software exposure (*see* Pl.'s SMF ¶¶ 7-8),[2] defendant justifies its non-selection of plaintiff based in part on his more limited expertise with mainframe hardware. (*See, e.g.*, Hill Dep. at 25:5-16, 26: 3-5.) As already noted, courts may not engage in "super-personnel" review or "reexamine[] an entity's business decisions.'" *Barbour*, 181 F.3d at 1346 (quoting *Dale*, 797 F.2d at 464). Accordingly, the Court declines to weigh in on either the GPO's erstwhile intent to replace its mainframe[3] or the desire of an agency to promote an employee with hardware – rather than software – expertise. If defendant had already eliminated its mainframe at the time of the selection, then a justification on mainframe hardware experience might be significant. But it is undisputed that the GPO mainframe is still in operation. (Steele Dep. at 24:16-17.) Not only would a reasonable juror find it acceptable to desire a Data Center Director with superior "hands-on" experience (see Hill

---

[2] Although plaintiff supports this dichotomy, *i.e.*, casting plaintiff as the software expert and Steele as the hardware expert, defendant saw Steele's qualifications as better-rounded than plaintiff. (*E.g.*, Hill Dep. at 25:5-22, 26:8 (citing both operational *and* programmatic qualifications of Steele).) The employer's conclusion that Steele was more qualified based upon a numerical rating system (*see infra* note 4) supports the Court's deference to the employer's decision even more strongly.

[3] It is worth noting that even if the GPO eliminated its mainframe, defendant's desire to hire "hands-on" and "operational" mainframe experience would still be reasonable if such qualities might be helpful during the transition to Oracle. Such considerations illustrate why courts are not equipped to micro-manage an agency's HR department or to second-guess quotidian business decision decisions.

Dep. at 26:3), but such a decision is among "an entity's business decisions" and thus not within the province of the courts.

In sum, plaintiff has failed to meet his burden "to establish that the proffered reasons are a pretext for discrimination" after defendant has articulated "a legitimate reason."[4] *See Hussain v. Principi*, 344 F. Supp. 2d 86, 98 (D.D.C. 2004), *aff'd sub nom. Hussain v. Nicholson*, 435 F.3d 359 (D.C. Cir. 2006). The GPO in this case exercised its "discretion to choose among equally qualified candidates," *Burdine*, 450 U.S. at 259, especially given plaintiff's admission that there is no stark difference in his qualifications as opposed to Steele. Therefore, plaintiff has not adduced sufficient evidence for a reasonable jury to find a pretext in defendant's criteria or process, so a reasonable jury could not find that the selection violated Title VII.

---

[4] In stark contrast with plaintiff's paucity of relevant evidence, defendant has shown that it seriously considered plaintiff's application and used a numerical grading system to weigh the applications. The selection process involved multiple agency officials tabulating and reviewing "actual data" that was the product of "scoring results." (Wash Dep. at 23:8-10.) Those results were generated by comparing the official KSA, which defined the qualifications for the promotion, with each application. (*Id.* at 23:3-16.) The data was created by weighing qualifications on a scale from zero to five, with Hill, the recommending official, "tr[ying] to be objective . . . in terms of experience and responses to the KSAs." (Hill Dep. at 24:3-7.) Hill avers in his affidavit that when he added up the zero-to-five scores from his grading system, Steele "received a higher overall score." (Def.'s Ex. 10 (Hill Aff., Sept. 22, 2008) ["Hill Aff."] ¶ 4.) Wash then confirmed Hill's selection by reviewing other materials such as the applicants' resumes, and determined that Steele was the "[b]est qualified for the role." (Wash Dep. at 23:5-6, 13-22.) Defendant did not only base that determination on Steele's operational experience after the fact (*see* Hill Aff. ¶ 5; Hill Dep. at 25:5-22, 26:1-11) but explained the role of Data Center Director as operational at the time of its creation. (*See* Steele Dep. at 12:9-16 [responding that O'Dell and Schweickhardt described the Data Center Director's duties as to "[m]anage the operations basically of the mainframe" when they created the role].) Meanwhile, in an internal communication months before the selection, O'Dell wrote that filling the vacancy of Data Center Director "would be a promotion and so [Steele] must compete." (Pl.'s Ex. 4 at 2.) All of this uncontroverted evidence points to a serious and objective process for considering and comparing plaintiff and Steele's applications.

### B. Pre-selection

Much is also made of the alleged pre-selection by defendant in its appointment of Steele to be Acting Director of the Data Center approximately seven months before announcing the permanent vacancy and beginning the selection process for a permanent director. Pre-selection, regardless of its propriety, is only relevant to this lawsuit inasmuch as plaintiff can demonstrate that the pre-selection itself was discriminatorily motivated. Because plaintiff does not allege or offer any evidence that a discriminatory animus factored in the pre-selection, the Court concludes that pre-selection does not bear on his discrimination claim.

The D.C. Circuit has distinguished between underlying discrimination claims and allegations of pre-selection that do not directly suggest discrimination. *Kolstad v. Am. Dental Ass'n*, 139 F.3d 958, 969 (D.C. Cir. 1998) (holding that except when related to the underlying discrimination, "pre-selection by itself is neither unusual nor illegal, much less egregiously wrongful"); *see Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 312 (D.D.C. 2005) ("[P]rocedural irregularities, pre-selection, [and] favoritism in the selection process" do not establish pretext "absent some actual evidence that defendant acted on a motivation to discriminate against plaintiff based on her age, race, or sex."); *Tolson v. James*, 315 F. Supp. 2d 110, 118 (D.D.C. 2004) ("Pre-selection does not violate Title VII unless it is based on discriminatory motives."). As a matter of practicality, "a substantial degree of pre-selection" can be expected "where the selection is to be made from among a narrow band of current employees well known to the selectors." *Kostad*, 139 F.3d at 969. Put simply, "plaintiff's pre-selection claim does not advance h[is] case for pretext unless [he] produces some evidence that discrimination played a role in [the selectee's] pre-selection and thus plaintiff's non-selection." *Oliver-Simon*, 384 F. Supp. 2d at 310.

Nor does a violation of an agency's regulations necessarily support a finding of discrimination. In *Johnson v. Lehman*, 679 F.2d 918, 921-22 (D.C. Cir. 1982), the D.C. Circuit analyzed in dicta the trial court's instruction to the jury that if it found a violation of the employer's regulations, it could find discrimination. Expressly applying Title VII principles, the Circuit Court concluded that the trial court had erred in giving such an instruction, because "a finding of a failure on the part of the . . . employer to follow its own regulations and procedures, alone, may not be sufficient" to demonstrate discrimination, unless it is "probative . . . in determining the true motivation behind the hiring decision." *Id.* at 922. That dictum supports the notion that a violation of human resources protocol does not create a *per se* inference of a Title VII violation. Courts have therefore found that violations of internal protocol may be probative of the employer's true motivation if, for example, the violation *itself* constituted a suspicious act, *Salazar v. Washington Metro. Transit Auth.*, 401 F.3d 504, 509 (D.C. Cir. 2005) (finding that "a jury could infer something 'fishy'" from a retaliation plaintiff's allegation that the target of his whistle-blowing later selected plaintiff's interviewers for a promotion, contrary to protocol); if the agency inexplicably departed from its normal procedures, *Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003) ("unexplained inconsistency can justify an inference of discriminatory motive"); or if the violation was an act that inherently "raises a credibility question" such as spoliation of evidence. *McIntyre*, 460 F. Supp. 2d at 138.

In the present case, plaintiff charges that the GPO allowed Steele to remain in the Acting Director role longer than allowed by internal GPO regulations, *see* GPO Reg. 615.2B(t)(2), and Wash concedes that "term limitations . . . were not complied with." (Wash Dep. at 37:20-22.) Plaintiff also repeatedly cites the "unfair" practice of appointing an acting officer to temporarily fill a vacancy for which that acting appointee will later compete. (*E.g.*, EEO Compl. at 1; Pl.'s

SGI ¶ 12.) O'Dell explained Steele's acting role in an email to Wash by writing that the "[i]ntent was to have [Steele] spend time as Acting and post internally. This would be a promotion and so he must compete." (Pl.'s Ex. 4 at 2.)

Plaintiff, however, has produced no evidence that discrimination played any role in the pre-selection or that the technical violation of GPO regulations was motivated by discrimination.[5] Moreover, because Steele was one of only four individuals – all GPO employees – who applied for the position of Data Center Director (Def.'s SMF ¶ 5), this was a situation "where the selection [wa]s to be made from among a narrow band of current employees well known to the selectors" and thus, "it is hard to see how there could not be a substantial degree of pre-selection." *See Kostad*, 139 F.3d at 969. Without a demonstrable relationship between the putative unfairness of this promotion system and any alleged discrimination, the pre-selection does not implicate Title VII.

---

[5] Nor has plaintiff produced any evidence that defendant had a practice of observing internal regulations on time limits. To the contrary, plaintiff suggests that defendant's treatment of Steele in the months before his promotion to Data Center Director was not unusual. (Pl.'s SGI ¶ 13.) Therefore, the violation of internal regulations in this case was not itself suspicious, did not constitute an inexplicable inconsistency with regular practices, and does not raise an issue as to defendant's credibility.

Moreover, plaintiff's assertion that "[i]t has been the practice of the GPO to place individuals in acting positions for extended periods" (*id.*) supports the Court's finding that a substantial degree of pre-selection is to be expected in this case.

15

## CONCLUSION

For the reasons stated herein the Court will grant defendant's motion for summary judgment. A separate Order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: July 27, 2010